[Cite as *In re R.A.*, 2020-Ohio-4846.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: R.A.

:
:
:    Appellate Case No. 28806
:
:    Trial Court Case No. 2018-5339
:
:    (Appeal from Common Pleas Court-
:    Juvenile Division)
:
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 9th day of October, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
    Attorney for Appellee, Montgomery County Children Services

CHARLES W. SLICER, III, Atty. Reg. No. 0059927, 426 Patterson Road, Kettering, Ohio 45419
    Attorney for Appellant, Mother

. . . . . . . . . . . . .

DONOVAN, J.

**{¶ 1}** Mother appeals from the juvenile court's judgment granting legal custody of her child, R.A., to his paternal grandmother ("Grandmother"). We hereby affirm the judgment of the juvenile court.

**{¶ 2}** On October 26, 2018, Montgomery County Children's Services ("MCCS") filed a neglect and dependency complaint with respect to R.A, who was born in 2004. The complaint alleged that MCCS received a referral on August 17, 2018 regarding Mother, who was arrested for failure to appear for driving under a suspended license and not having a license plate; R.A.'s whereabouts were unknown at the time of Mother's arrest, and he was subsequently located at the home of a friend. The complaint further stated that the police discovered that Mother's home did not have running water. Mother agreed to place R.A. with her neighbors, R.H. and J.H., on a safety plan. The complaint stated that MCCS received reports of domestic violence between Mother and her boyfriend, J.W., and that the couple had an "extensive history with substance abuse issues." Although Mother and J.W. reported that they were engaging in substance abuse treatment, they had not provided verification of this treatment to MCCS. MCCS further alleged that, on September 13, 2018, Mother refused a drug screen because she claimed it would be positive, stating that her "drug of choice" was methamphetamines. According to the complaint, Mother reported that she had been prescribed methadone.

**{¶ 3}** Additionally, the complaint provided that Mother was not employed and had a ninth grade education. The complaint stated that R.A. did not have a close relationship with his father ("Father"), but that Father had visited regularly while R.A. was on the safety plan; "both recognize[d] that they need more time to become more acquainted." Finally, the complaint stated that R.A. was on a truancy plan at his school due to numerous

absences.

{¶ 4} The trial court conducted a hearing and, on November 7, 2018, the magistrate issued an interim order that R.A. remain on the safety plan. The magistrate scheduled an adjudication on November 28, 2018. After the adjudication, a magistrate granted temporary custody of R.A. to Mother's neighbors, R.H. and J.H.

{¶ 5} On May 30, 2019, MCCS filed a motion to transfer temporary custody from the non-relative neighbors to Grandmother, or for legal custody to Grandmother, or for temporary custody to MCCS. The attached affidavit of Emily Thompson, a caseworker at MCCS, stated that the neighbors were no longer willing to care for R.A. and that there were safety concerns due to the proximity of the neighbors' home to the home of Mother and J.W. The affidavit asserted that Mother and J.W. threatened the neighbors, that Mother's case plan objectives were not complete, that Mother continued to struggle to maintain sobriety, and that she was referred for domestic violence services but did not follow through. Thompson averred that there was concern for Mother "as her mental health appear[ed] to be deteriorating," and MCCS observed Mother "present as paranoid and confused." MCCS believed that it was in R.A.'s best interest to request that additional contact between Mother and child be suspended until Mother had a negative drug screen. Thompson's affidavit stated that Mother's boyfriend was not an appropriate caretaker for R.A. Thompson averred that Father had not been in contact with R.A. since November 7, 2018, that it was reported to the agency that he "was recently shot multiple times," requiring hospitalization, and that Father did not have housing or verifiable income.

{¶ 6} On June 26, 2019, the magistrate granted interim temporary custody of R.A.

to Grandmother after a hearing. At the hearing, Mother indicated that she was in agreement with the transfer of custody to Grandmother Thompson testified that Mother and J.W.'s backyard backed up to R.H. and J.H.'s back yard, and that there had been a lot of arguing between the households. She stated that R.H. and J.H. had agreed to keep R.A. until the end of the school year and then requested that MCCS find an alternative placement. Thompson testified that R.A. had been with Grandmother since the end of May and that he was the happiest Thompson had seen him since he had been there. Grandmother provided "a safe, stable home, and a good environment that's kind of away from the neighborhood that he's been in, which caused conflict." Thompson stated that substance abuse, lack of utilities, and domestic violence were the primary concerns that caused R.A.'s removal, and that there had not really been any progress on those issues. She also stated that Mother got a daily dose of methadone at Dayton Treatment Services, but that her counselor there reported to Thompson that, in "well over a year," Mother had "not had a negative drug screen the entire time," testing positive for "methamphetamines, fentanyl, and heroin, or any combination of these three, every time she's been screened." Thompson stated that J.W. had been "negatively discharged from the program and trespassed from their property after he was observed by staff slashing someone's tires in the parking lot." Thompson had spoken to Mother multiple times about completing a mental health assessment and addressing domestic violence concerns, but had not been done. Thompson also stated that Mother and J.W.'s utilities had been "turned back on and off at least three times" and the water had been turned off; when she was at the home in May before the hearing, the gas was still turned off, but they did have electricity.

**{¶ 7}** Thompson had not had any contact with Father since the first court hearing, Father had not had any contact with R.A., and Thompson was unable to locate Father. Thompson stated that, after a visitation, both Mother and J.W. were "verbally assaultive" to Grandmother when she picked up R.A., and that Grandmother did not feel safe in the course of the encounter. Thompson stated that future visitation should be supervised and occur only after Mother demonstrated sobriety. She stated that R.A. reported that, during his visits, he often "doesn't even speak to his mom, and if he does, usually she's * * * not very kind to him." Thompson continued to provide Mother with names for services and a resource directory with names of places she could go for a mental health assessment. According to Thompson, Mother often did not recall their meeting from week to week; "I just don't think she's cognitively or mentally stable right now." Thompson stated that Mother's treatment at Dayton Treatment Services was not sufficient; Mother was required to meet with her counselor weekly one-on-one, but the counselor reported that Mother only met with her if the counselor "flagged" Mother, which meant Mother could not "get dosed that day" unless she met with the counselor. Thompson stated that Mother needed consistent individual therapy and group outpatient therapy, and "probably inpatient therapy," since she had not been able to abstain from substances the entire time she had been in treatment. Thompson stated that Mother had not made any progress in addressing MCCS's concerns, and that the agency had provided case management, services referral, home studies and bus passes.

**{¶ 8}** On cross-examination, Thompson indicated that the counselor she spoke to at Dayton Treatment Services was "Bridget," and Mother informed the court that Bridget no longer worked there. Mother stated that Thompson had not offered her any kind of

referrals. Mother acknowledged that she had a resource guide but denied that Thompson gave it to her. The following exchange occurred:

THE COURT: Ms. Thompson isn't going to call Nova House to schedule an appointment for you. The resource guide is the guide.

[MOTHER]: No one said anything about Nova House.

THE COURT: * * * I just want to make sure we're clear about how this works. The * * * Agency's position is the Dayton Treatment Center is not a sufficient treatment program. So you need to utilize that resource guide and contact another treatment provider to get an assessment.

[MOTHER]: Okay.

THE COURT: Along with a mental health assessment, as well.

[MOTHER]: Yes, ma'am.

THE COURT: So those things you need to take steps to get those appointments scheduled.

[MOTHER]: Okay.

{¶ 9} At the conclusion of the hearing, the magistrate terminated R.H. and J.H.'s custody and transferred interim custody to Grandmother. The court scheduled another hearing for September 11, 2019.

{¶ 10} On September 10, 2019, at 3:02 p.m., Mother's attorney filed a motion to withdraw, asserting that the attorney-client relationship had "broken down" to the point that it was impossible for counsel to effectively represent Mother.

{¶ 11} Mother did not attend the hearing on September 11, 2019. The prosecutor represented to the court that Mother was served with the May 30, 2019 motion at her

residence, and that she was present at the June 26, 2019 hearing when the September hearing was scheduled. Mother's attorney stated that, the previous day, Mother had indicated that she wished to fire him at that time and to get new representation before going forward. The attorney also requested a continuance of the hearing based on Mother's absence. MCCS opposed the motion to continue, noting that Mother had sufficient notice of the hearing, sufficient opportunity to work with her current assigned counsel or to obtain new counsel prior to the hearing date, and also had had opportunity to work with MCCS, but failed to do so. MCCS also expressed that it was in the child's best interest to proceed.

{¶ 12} The court denied the request for a continuance and for new counsel. The court found that Mother had not shown good cause to terminate her attorney's representation in the custody matter, which had continued effectively over "a substantial period of time." Mother had not previously raised any issues or concerns about her counsel, who had been diligent in representing her, and the court did not find that there was sufficient evidence of such a breakdown in communication that counsel could not represent Mother adequately.

{¶ 13} Grandmother testified at the hearing that she did not know that R.A. had been in "foster care" or she would have started proceedings to gain custody earlier. Grandmother stated that R.A. came into her care in May 2019; before that, Mother repeatedly told her that R.A. was not her grandson. According to Grandmother, R.A. was in eighth grade, he and she were bonded, and he was doing "great." She stated that her ex-husband also was involved in R.A.'s life and "takes him places," and that her daughters were involved as well. When asked if she was willing to continue providing

care for R.A. as his legal custodian, Grandmother responded, "Most definitely." She stated that she had signed a statement of understanding of legal custody.

{¶ 14} MCCS caseworker Thompson testified that, when MCCS became involved with R.A. in August 2018, there were concerns regarding the condition of the home, including numerous holes in the walls, a lack of working utilities, domestic violence between J.W. and Mother, and drug use in the home by both Mother and J.W. She described the conflict between Mother and J.W. and the neighbors who took custody of R.A. Thompson had contacted the paternal grandfather to ask if he knew of any relatives on R.A.'s father's side of the family who might take custody of the child, because Mother wouldn't provide her with any information. The grandfather got in touch with his ex-wife, Grandmother, who immediately contacted Thompson and requested a home study. According to Thompson, R.A. reported that he loved Mother and J.W., but that he knew that was "not a good environment for him," and he had a good bond with Grandmother; "that's home for him now."

{¶ 15} Thompson testified that R.A. attended middle school and was doing "pretty well." His new school was in a smaller town, but he was adjusting, making friends, and doing well academically for the most part. R.A. was not on an IEP and was not interested in obtaining counseling; Grandmother was aware of where to get services and was willing to do so, if R.A. should need them in the future.

{¶ 16} Thompson further testified that she was last in Mother's home on May 14, 2019; they had gotten a new puppy, and Thompson recounted that there was a strong chemical smell in the home, "as well as like a urine smell." She did not believe the home had gas or water, and she was not allowed to walk through the entire home. Thompson

testified that she called DP&L the morning before the hearing and confirmed that Mother's home had electricity, but it did not have gas through Vectren and did not have running water.

{¶ 17} Thompson testified that J.W.'s family owned the home in which he and Mother lived; J.W., who was a mechanic, recently appeared in court for zoning issues, namely "auto parts and things all over the yard." Thompson stated that she asked Mother and J.W. to "engage in services" before MCCS would pay for their utilities to be turned back on. In November or December 2018, J.W.'s mother or grandmother paid the water bill and got the water turned back on. Thompson stated that she also discussed with and offered to help Mother obtain employment so that she would be able to pay the utility bills in the home, and gave her resources for the Job Center. J.W. reported that he was self-employed, had plenty of income, and did not need assistance. In May 2019, Mother reported to Thompson that she believed J.W. was "collecting some type of income for her." Mother also believed J.W. was getting SSI, but neither she nor Thompson had been able to verify that. According to Thompson, Mother "was a bit delusional at the time that I was talking to her, really paranoid about [her belief] that he was collecting some sort of income for her."

{¶ 18} According to Thompson, Mother reported ongoing domestic violence and that J.W. was "controlling," recorded all of her phone calls, and recorded "everybody that came in and out of the house." Thompson testified that she gave Mother information about Artemis and offered to call with Mother to arrange safe housing, but Mother declined any services.

{¶ 19} Thompson stated that Mother was in substance abuse treatment at Dayton

Treatment Services (also known as Pinnacle); Mother had never completed the mental health assessment, but she had continued ongoing drug and alcohol services. To Thompson's knowledge, however, "all she's doing there is going daily to get her methadone. She's not participating in groups, or anything like that." Thompson stated that Mother continued to test positive for drugs; out of 39 drug screens from June 2018 through September 9, 2019, Mother tested positive for methamphetamines 39 times and positive for fentanyl 31 times, and "numerous other drugs" also appeared throughout that time.

Thompson testified that Mother always reported to her that she was not using drugs and signed releases for her test results, but then Mother would tell Pinnacle only to release her attendance records to Thompson, not her drug screens. Mother also claimed she was attending treatment and was sober, so there was no need for Thompson to refer her elsewhere. Thompson gave Mother the resource guide numerous times, highlighted where she could go, and told her she could get a walk-in mental health assessment at Samaritan Behavioral. At the previous court hearing, Mother and Thompson talked about getting a mental health assessment done before the next court hearing, but Mother never followed through.

{¶ 20} Thompson stated that Mother had not visited R.A. since Grandmother received custody, but that she had had phone contact with him. Thompson reported that Grandmother did not feel safe bringing R.A. to visit Mother snd J.W. due to their violent and aggressive behavior. Thompson stated that Mother's case plan was not complete.

{¶ 21} Thompson testified that Father was arrested for felonious assault the month before the hearing and in July for a drug charge; R.A. had not seen his father since he

visited Father in the hospital after Father was shot in March or April 2019.

{¶ 22} Thompson stated that granting custody to Grandmother was in R.A.'s best interest, because the conditions in Mother's home were worse at the time of the hearing than they had been at the time of R.A.'s removal, and R.A. had "expressed a desire to have closure and finality to his situation."

{¶ 23} On cross-examination, when Thompson was asked if she had been in the home since May 2019, Thompson responded, "No, they wouldn't let me in last night." Thompson stated that the zoning issues were limited to the outside of the home. Thompson testified that she asked Mother the night before the hearing if she had completed the mental health assessment, and Mother stated that she had not. Regarding J.W.'s recordings of Mother, Thompson testified that she had seen the camera J.W. used to record everything and that there were "cameras throughout the home and the outside of the home." Thompson also testified that, inside the home, there "were holes that looked like they were either kicked or punched in the walls." Thompson testified that, when she talked with Mother the day before the hearing, Mother did not ask her about R.A. Mother and J.W. were leaving the home as Thompson arrived; Thompson told them she was stopping by to remind them of the court date and asked them "to come inside and * * * get an update. And they said no, that they were on their way out." Thompson testified that Mother "went on" about how she had fired her attorney, was getting a continuance of the hearing, and still did not understand why R.A. was taken away; Mother also denied having a positive drug screen.

{¶ 24} In response to a question by the court, Thompson stated that in May 2019 when she visited the home, Mother invited her in and they talked "for a good hour plus";

Mother stated that " she normally can't talk much because [J.W.'s] there and he monitors everything that she does. But she was also getting ready to go pick him up and bail him out of jail." Thompson testified that Mother never specifically disclosed any physical violence but talked a lot about J.W.'s controlling behavior. According to Thompson, when talking with Mother, "it was hard to tell what was reality and what was delusional," or if Mother was under the influence of drugs, "but she was going in lots of circles talking about how she thinks she had brain tumors, that she thinks [J.W.] * * * knows what's wrong with her medically and hides it from her; that she thought he was collecting income." Thompson suggested that Mother go to the ER if she felt ill, but that even though they talked and Thompson gave Mother information, Mother "was still convinced she was going to get [J.W.] out of jail and she wasn't going to try to go to the shelter."

{¶ 25} At the hearing, the guardian ad litem (GAL) recommended custody to Grandmother, and her report was admitted.

{¶ 26} The magistrate found that MCCS had made reasonable efforts at reunification and permanency. Based upon the testimony at the hearing, the magistrate found that reunification was not possible because Mother had failed to address the concerns that led to the child's removal and his continued removal from her care. The magistrate further found at the hearing:

> As Ms. Thompson credibly testified, the conditions have actually worsened since that removal. The home conditions remain in very poor conditions, and mother has not * * * made any effort to make those differences in that home. They apparently * * * do not have water and gas; electricity issues have been an ongoing issue regarding this family,

regarding those utilities.

Mother doesn't have income for herself, and * * * the relationship with * * * her boyfriend * * * is very poor. It's a toxic, unhealthy relationship, and that was an ongoing concern at the initial removal, as well.

Moreover, mother has not addressed substance abuse concerns. That's one of the primary issues of this case. She is engaged with Pinnacle, but continues to test positive for multiple substances * * *.

And finally, there are issues with her relationship with [R.A.], and she hasn't demonstrated an ability to provide a safe and permanent home for him. [R.A.] has done great with his grandmother. He has expressed that that's a safe and pleasant place for him to be. By all accounts, he is doing well. A home study was approved. He is bonded * * * to her, and they have a positive relationship. That's the report from the CASA, as well as from the caseworker. And she is clearly in the best position to provide for his safety, health, welfare and overall well-being.

And after considering the pertinent best interest factors, the Court finds that granting legal custody to [Grandmother] is in [R.A.'s] best interest.

{¶ 27} The magistrate's order was consistent with these oral pronouncements, stating that, after considering the best interest factors in R.C. 2151.414(D)(1) and R.C. 3109.04(F), the magistrate concluded that granting legal custody to Grandmother was in R.A.'s best interest. The magistrate also concluded that counsel's request to withdraw was untimely and would cause unnecessary delay in the case.

{¶ 28} Mother filed objections to the magistrate's conclusions on September 17,

2019. MCCS filed a reply on September 26, 2019. Mother supplemented her objections on January 9, 2020. In her supplemental objections, Mother asserted that the magistrate's decision was not supported by sufficient evidence and was against the manifest weight of the evidence, that the magistrate erred in finding that there were domestic violence issues in Mother's home that had not been addressed, and that Mother had not cured her housing issues or engaged in substance abuse treatment. Mother acknowledged that she had not completed all of her case plan objectives, she argued that she was at least in the process of completing them, and there would be "no harm in giving her additional time to complete those objectives." Mother also argued that a longer transition period should have been explored, involving Mother, Grandmother, and R.A.; "[t]his transition time would have allow[ed] Mother to complete her case plan objectives and compel the entire family to be in family counseling which would bring these families together instead of testing the relationship between [R.A.] and paternal grandmother – a relationship that was in its infancy – by granting paternal grandmother legal custody."

{¶ 29} MCCS filed a reply to Mother's supplemental objections on January 30, 2020.

{¶ 30} On May 8, 2020, the juvenile court filed a judgment entry that overruled Mother's objections, adopted the magistrate's findings, and granted legal custody to Grandmother. The court reviewed the best interest factors set forth in R.C. 3109.04(F)(1) and in R.C. 2151.414(D). The court found:

> * * * [L]egal custody of the child to [Grandmother] is in his best
> interest. Neither Mother nor Father are able to adequately care for the
> child. Mother has not completed her case plan objectives and has made

little, if any, progress toward doing so. Father has not been in contact with MCCS. The child needs to continue residing in a safe and stable home environment and is in need of a legally secure and permanent placement, which legal custody achieves. Further, the child has made progress in his placement with his paternal grandmother where all his basic needs are being met. Paternal grandmother is a relative who is willing and able to care for the child and who has been meeting the child's basic needs with success. Based upon the testimony presented, the Court has serious concerns about Mother's ability to appropriately address the child's needs.

{¶ 31} Mother appeals from the trial court's judgment, raising three assignments of error. Her first assignment of error states:

THE COURT ERRED IN REFUSING TO GRANT A REASONABLE CONTINUANCE IN THIS MATTER.

{¶ 32} Mother argues that her motion for a continuance should have been granted because the length of delay would have been minimal and it should not have taken new counsel too long to review the file and prepare for the hearing. She also argues that, because she had "legitimate reasons" for a continuance, she was under the impression that the hearing would be continued and was not there to present her own account of the events that had transpired or to speak concerning her son's best interests." She asserts that she could have clarified whether the house had utilities, how and when holes came to be in the wall of her home, and whether domestic violence had actually occurred if she had been there. Mother also argues that she had no opportunity to express why she was dissatisfied with her attorney's representation in this matter, and therefore "the

potential existed that the best interests of [R.A.] and her own constitutional interest in raising her son were jeopardized through ineffective assistance of counsel."

**{¶ 33}** MCCS responds that, because Mother's motion "came at the eleventh hour," Mother herself was "the sole reason for both the motion itself and its last-minute filing," and a continuance would have unreasonably inconvenienced everyone else involved, the juvenile court acted within its discretion in denying Mother's motion.

**{¶ 34}** As this Court has noted:

The standard of review of a trial court's decision on a motion for continuance of a trial is an abuse of discretion. *State v. Unger* (1981), 67 Ohio St.2d 65, 67, 21 O.O.3d 41, 423 N.E.2d 1078. " 'Abuse of discretion' has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 482 N.E.2d 1248. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.

"A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo,* would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result." *AAAA Ents., Inc. v. River Place Community Redevelopment* (1990), 50 Ohio St.3d 157, 161, 553 N.E.2d 597.

"In evaluating a motion for a continuance, a court should note, inter

alia: the length of the delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." *Unger,* 67 Ohio St.2d at 67-68, 21 O.O.3d 41, 423 N.E.2d 1078.

*Hoening v. Frick*, 187 Ohio App.3d 139, 2010-Ohio-1788, 931 N.E.2d 211, ¶10-12.

{¶ 35} We see no abuse of discretion in the juvenile court's denial of Mother's request for a continuance. It is unclear how long any delay would have been to allow Mother to obtain new counsel, and Mother had not previously requested any continuances. She further did not express any dissatisfaction with counsel's representation at the June 26, 2019 hearing, and the magistrate found that counsel "effectively represented mother for a substantial period of time." We conclude that a continuance would have been inconvenient for Grandmother and especially for R.A. R.A. had been residing with Grandmother since the end of May, and at the time of the June 26, 2019 hearing, Mother had not had a negative drug screen in over a year, and she was using methamphetamines, fentanyl, and heroin. The trial court reasonably concluded that Mother's request for a continuance was not for a legitimate reason but was contrived and dilatory. At the start of the June hearing, Mother indicated that she was in favor of Grandmother obtaining custody, and she did not file a motion seeking the return of his custody before the September hearing. Mother was aware of the date and

time of the September hearing and simply did not appear. Her assertion that "the potential existed" that R.A.'s best interests and her own interest in raising her son were jeopardized is speculative. For the foregoing reasons, Mother's first assignment of error is overruled.

{¶ 36} We will consider Mother's second and third assignments of error together. They are as follows:

THE COURT ERRED IN FINDING THAT THE AGENCY HAD MADE REASONABLE EFFORTS FOR PURPOSES OF REUNIFICATION AND PERMANENCY.

THE COURT ERRED IN FINDING THAT REUNIFICATION IS NOT POSSIBLE AND THAT GRANTING LEGAL CUSTODY OF THE CHILD TO HIS GRANDMOTHER IS IN HIS BEST INTERESTS.

{¶ 37} Mother asserts in the second assigned error that the caseworker seems to have done very little to assist Mother with reunification efforts other give Mother a brochure. According to Mother, these efforts were insufficient, and the court erred in finding that MCCS made reasonable efforts toward "reunification and permanency."

{¶ 38} In her third assignment of error, Mother argues that, despite MCCS's concerns about whether her home had "working utilities, domestic violence and drug use," caseworker Thompson had not been inside Mother's home since May 2019, months before the September 11, 2019 hearing. Therefore, she asserts that the court's conclusion that the conditions had worsened since R.A.'s removal was unwarranted. Mother also argues that Thompson "provided unverified hearsay, without objection," about whether the house had gas and running water. Mother was unable to rebut these

claims because she "was under the impression that the hearing had been continued, and was not present to shed light on this issue."

{¶ 39} Mother further asserts that, while Thompson indicated that she directed Mother to the Job Center, J.W. had plenty of income, and it did not appear that the couple needed assistance. Regarding domestic violence, Mother asserts that Thompson did not know how the holes in the walls were made and that, according that Thompson, Mother had "never disclosed the existence of physical violence – just that her paramour was controlling." Finally, Mother asserts that she was attending drug treatment and reported she was sober, she wanted custody of R.A., and she did not understand why he was removed from her home.

{¶ 40} As this Court has previously noted, a "court may award legal custody of a dependent child to a parent or to any other person who asks for legal custody or is proposed as a legal custodian." R.C. 2151.353(A)(3); *In re R.H.B., L.M.B., and L.M.B.*, 2d Dist. Clark Nos. 2015-CA-12, 2015-CA-14, 2016-Ohio-729, ¶ 7. Further,

When a juvenile court makes a custody determination under R.C. 2151.353, it must do so in accordance with the "best interest of the child" standard set forth in R.C. 3109.04(F)(1). See *In re Poling*, 64 Ohio St.3d 211, 594 N.E.2d 589, 1992-Ohio-144, paragraph two of the syllabus, and R.C. 2151.23(F)(1) (requiring a juvenile court to exercise its jurisdiction in accordance with R.C. 3109.04 as well as other sections of the Ohio Revised Code). The factors a court must consider in determining a child's best interest include such things as the parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings,

and others who may significantly affect the child's best interests; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons. * * *

*In re D.S.*, 2d Dist. Clark No. 2013 CA 51, 2014-Ohio-2444, ¶ 9.

{¶ 41} As this Court has further noted:

In a legal custody dispute, as opposed to a more drastic termination of parental rights, a court must find by a preponderance of the evidence that its decision is in the child's best interest. *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912,, ¶ 15, quoting *Black's Law Dictionary* 1182 (6th Ed. 1998). * * * "A finding of an error in law is a legitimate ground for reversal, but a difference of opinion on credibility of witnesses and evidence is not." *Seasons Coal Co. v. City of Cleveland*, 10 Ohio St.3d 77, 81, 461 N.E.2d 1273 (1984).

*In re R.H.B., L.M.B., and L.M.B.* at ¶ 19.

{¶ 42} We will not reverse the trial court's award of legal custody absent an abuse of discretion. *In re M.O.,* 2d Dist. Montgomery No. 26457, 2015-Ohio-2430, ¶ 7; *In re J.T.,* 2d Dist. Montgomery No. 27343, 2017-Ohio-1303, ¶ 10.

{¶ 43} As noted by the Ohio Supreme Court:

The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the

impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. *Trickey v. Trickey*, (1952), 158 Ohio St. 9, 13, 47 O.O. 481, 483, 106 N.E.2d 772, 774. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct. See *Seasons Coal Co. v. Cleveland*, (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276.

*Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988).

{¶ 44} R.C. 2151.419(A)(1) provides:

Except as provided in division (A)(2) of this section, at any hearing held pursuant to section 2151.28, division (E) of section 2151.31, or section 2151.314, 2151.33. or 2151.353 of the Revised Code at which the court removes a child from the child's home or continues the removal of a child from the child's home, the court shall determine whether the public children services agency or private child placing agency that filed the complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home. The agency shall have the burden of proving that it has made those reasonable efforts. * * * In determining whether

reasonable efforts were made, the child's health and safety shall be paramount.

{¶ 45} Regarding Mother's second assignment of error, the record reflects that MCCS developed a case plan for Mother as required by R.C. 2151.412. MCCS also provided information and referrals, conducted home visits and home studies, provided case management services and transportation assistance. Mother was given a highlighted resource directory for services (and directly advised by the magistrate that it was her responsibility to follow through). Mother did not complete her case plan. The juvenile court reasonably concluded that MCCS established that it made reasonable efforts to reunify Mother and R.A. Mother's second assignment of error is overruled.

{¶ 46} Finally, the juvenile court reasonably concluded that reunification was not possible within a reasonable time and that granting legal custody to Grandmother was in R.A.'s best interest. As noted above, Mother agreed to the interim order granting custody to Grandmother, she did not seek a return of custody from the court, and she failed to attend the final hearing. Grandmother and R.A. were bonded, and R.A. was bonded to other family members of Grandmother. R.A. had been in the home since May 2019. Thompson testified that R.A. was the happiest she had ever seen him and that R.A. considered Grandmother's home his own. She testified that Grandmother's home was safe, stable, and away from the conflict that characterized his placement with R.H and J.H. Thompson testified that R.A. relayed that he often did not speak with Mother, that she was not very kind to him during visitation, and that Mother did not ask her about R.A. before the September hearing. She also testified that R.A. was adjusting, making some new friends, and doing well academically. She testified that Grandmother would

obtain counseling for R.A. if the need arose.

{¶ 47} Regarding Mother's mental health, the evidence revealed that she failed to make progress with her serious substance abuse issues, repeatedly testing positive for methamphetamines, fentanyl, and heroin. Mother failed to pass 39 out of 39 drug screens. Thompson did not believe Mother was cognitively or mentally stable, and Mother repeatedly refused to complete the mental health assessment.

{¶ 48} The trial court reasonably concluded that R.A. needed a legally secure permanent placement. Thompson testified that he wanted closure and finality. In addition to her serious substance abuse issues, Mother still lacked suitable housing due to issues with utilities, and she had no income of her own. Despite her assertion that J.W. had sufficient income, his income had not been verified, and the couple struggled to maintain their utilities. Regarding Mother's assertion about the condition of her home, we note that at the time of the complaint, the home was without water, and at the time of Thompson's last visit in May 2019, there was no gas or water, and the home smelled of chemicals and urine. The juvenile court reasonably concluded that the conditions in the home had worsened.

{¶ 49} Mother had previously reported incidents of domestic violence to Thompson. The GAL's report stated that R.A. had reported witnessing J.W. "physically and emotionally abusing Mother," and that Mother had admitted to the GAL that she was a victim of domestic violence and wished to leave J.W. Mother and J.W. had been verbally assaultive to Grandmother when she arrived to pick up R.A., causing her to feel unsafe. The juvenile reasonably determined that, based on to the best interest factors in R.C. 3109.04(F)(1) and R.C. 2151.414(D), legal custody of R.A. to Grandmother was

in the child's best interest by a preponderance of the evidence.   There being no abuse of discretion, Mother's third assignment of error is overruled.

{¶ 50} The judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Charles W. Slicer, III
Father
Grandmother
Hon. Anthony Capizzi